STEPHEN G. LARSON (SBN 145225)
*E-mail: slarson@larsonobrienlaw.com*
PAUL A. RIGALI (SBN 262948)
*E-mail: prigali@larsonobrienlaw.com*
R.C. HARLAN (SBN 234279)
*E-mail: rcharlan@larsonobrienlaw.com*
LARSON O'BRIEN LLP
555 S. Flower Street, Suite 4400
Los Angeles, California 90071
Telephone: (213) 436-4888
Facsimile: (213) 623-2000

Attorneys for Petitioners
MARCIANO ABADILLA, et al.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| MARCIANO ABADILLA, et al.,<br><br>　　Petitioners,<br><br>　　v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>　　Respondent. | Case No. 3:18-CV-07343-EMC<br><br>**DECLARATION OF TOM KAYES IN SUPPORT OF REPLY TO MOTION TO COMPEL ARBITRATION**<br><br>*[Filed concurrently with Petitioners' Reply in support of Motion to Compel Arbitration]*<br><br>Date: February 14, 2019<br>Time: 1:30 p.m.<br>Judge: Hon. Edward M. Chen<br><br>Action filed: December 5, 2018 |

# DECLARATION OF TOM KAYES

1. I am over 18 years of age.

2. I have personal knowledge of the facts stated in this declaration and, if called to testify, could and would testify to them.

3. I am an associate at Keller Lenkner LLC.

**For Months, Uber Agreed That It Would Pay All Filing Fees Related to Claimants' Arbitrations**

4. Our firm began serving demands for arbitration on Uber in August 2018.

5. On August 22, 2018, Sophia Behnia and Andrew Spurchise of Littler Mendelson P.C. joined Ashley Keller, Warren Postman, and me on a conference call to discuss the demands.

6. On that call, we explained to Ms. Behnia and Mr. Spurchise our clients' position on arbitration filing fees. Just as now, our position then was that Uber is equitably estopped based on its statements in *Mohamed v. Uber*, in the U.S. Court of Appeals for the Ninth Circuit from asking a driver to pay any portion of the JAMS filing fee.

7. On the August 22 call, Mr. Spurchise disputed the estoppel argument but acknowledged that, under Uber's arbitration agreement, if there is a dispute about the filing fee, then Uber will "bear all of the Arbitrator's and arbitration fees until such time as the Arbitrator resolves any such dispute." *See* Dkt. No. 3-2 at 21.

8. Mr. Spurchise was referring to Section 15.3(vi) of Uber's arbitration agreement, which provides: "Any disputes in that regard [i.e., about arbitration fees] will be resolved by the Arbitrator as soon as practicable after the Arbitrator is selected, and Company shall bear all of the Arbitrator's and arbitration fees until such time as the Arbitrator resolves any such dispute." *See id*.

9. On the August 22 call, Mr. Spurchise said Uber would pay the arbitration filing fees—including the disputed portion—and raise its opposition to the estoppel argument before each individual arbitrator.

10. On September 5, 2018, Mr. Postman wrote an e-mail to Mr. Spurchise and Ms. Behnia, summarizing the conference call and reiterating Claimants' position that "Uber is

equitably estopped based on its statements in *Mohamed* from asking a driver to pay any portion of the JAMS filing fee." Mr. Postman's e-mail acknowledged that, "[w]hile I understand that Uber disputes this point, the arbitration agreement states that the 'Company shall bear all of the Arbitrator's and arbitration fees until such time as the Arbitrator resolves any such dispute.' We hereby demand that Uber pay the full JAMS filing fee for each of the attached clients so that we may commence arbitration." Attached hereto as **Exhibit A** is a true and correct copy of that e-mail correspondence dated September 5, 2018.

11. That same day, Ms. Behnia responded to Mr. Postman's e-mail and repeated Uber's position: "[W]e can work with JAMS on logistics and filing fees (we will raise the fee dispute with the arbitrators once they are assigned)." Attached hereto as **Exhibit B** is a true and correct copy of that e-mail correspondence dated September 5, 2018.

12. Ms. Behnia sent another e-mail that same day, promising that she would "work with Uber to make sure payment is processed in a timely manner." Attached hereto as **Exhibit C** is a true and correct copy of that e-mail correspondence dated September 5, 2018.

13. On September 18, 2018, Ms. Behnia reiterated that Uber would pay all of the arbitration filing fees and would take up its dispute with the estoppel argument with individual arbitrators: "We'll file a motion on the fee dispute once arbitrators are assigned." Attached hereto as **Exhibit D** is a true and correct copy of that e-mail correspondence dated September 18, 2018.

14. In that same e-mail, Ms. Behnia confirmed that "[t]he arbitration doesn't commence until the filing fee is received." *See* **Exhibit D**.

15. Shortly thereafter, Ms. Behnia again set out the same position, this time to Sandra Chan, the JAMS ADR Consultant coordinating our clients' arbitration demands. Ms. Behnia wrote: "Uber requests that Claimants pay $400 of the $1500 filing fee in each matter. However, Claimants have refused to follow the holding in *Armendariz*. Accordingly, per the terms of the December 2015 Rasier Technology Services Agreement, Uber will front Claimants' portion of the filing fees, and then Uber will raise this dispute with each arbitrator once arbitrators are assigned." Attached hereto as **Exhibit E** is a true and correct copy of that e-mail correspondence dated October 3, 2018.

16. One week later, Ms. Behnia again stated that Uber would pay the entire $1,500 filing fee and then raise the issue with individual arbitrators: "At that point, Uber will already have paid filing fees, taken time to select an arbitrator, attended an initial arbitration management conference, filed a motion to disqualify your firm as counsel, filed a motion to compel your clients to contribute to the filing fees, etc." Attached hereto as **Exhibit F** is a true and correct copy of that e-mail correspondence dated October 10, 2018.

17. A few days later, Mr. Postman e-mailed Ms. Behnia and Mr. Spurchise, seeking an explanation for why Uber had not yet paid filing fees for the outstanding demands. He explained: "There are roughly 350 clients for whom we served demands on Uber over two months ago. There are another 3,247 demands that were served 4 weeks ago or more, and an additional 3,117 demands that were served a week or more ago." He then asked: "Is Uber refusing to pay the filing fees to commence these arbitrations; if not, when will Uber pay them?" Attached hereto as **Exhibit G** is a true and correct copy of that e-mail correspondence dated October 15, 2018.

18. Mr. Spurchise responded the next day: "Warren—I'll check with Uber on this issue and circle back." Attached hereto as **Exhibit H** is a true and correct copy of that e-mail correspondence dated October 16, 2018.

19. A few days later, Mr. Spurchise wrote again, saying "Uber has never indicated it was unwilling to pay its required portion of the arbitration fees, and it remains willing to pay its required portion of the arbitration fees. And despite the fact that Uber feels your argument for not paying claimants' required portion of the fee has been made in bad faith (and Uber reserves all rights and remedies in that regard), Uber has already paid the full initiation fee for dozens of arbitrations." Attached hereto as **Exhibit I** is a true and correct copy of that e-mail correspondence dated October 18, 2018.

20. Mr. Postman responded to Mr. Spurchise's assertion that the estoppel argument was raised in bad faith. He wrote: "Finally, I would note that this is the first time that you have suggested our equitable estoppel position is taken in bad faith. As we stated in our demand, the Ninth Circuit compelled arbitration in *Mohamed* in reliance on the fact that 'Uber has committed to paying the full costs of arbitration.' We therefore think there is a strong argument that Uber is

equitably estopped from taking a different position now. We understand that Uber disagrees with this position and don't need to litigate the issue here." Attached hereto as **Exhibit J** is a true and correct copy of that e-mail correspondence dated October 18, 2018.

21. Mr. Spurchise responded that "Uber is currently working on processing the next tranche of invoices" and "agree[d]" that "we don't need to litigate the fee apportionment issue here." Attached hereto as **Exhibit K** is a true and correct copy of that e-mail correspondence dated October 19, 2018.

22. In response to another question from Mr. Postman about when Uber would pay the outstanding filing fees, Mr. Spurchise again stated that Uber intended to pay according to its agreement: "Warren—as I understand it, Uber is intending to process the invoices in the order that they came in." Attached hereto as **Exhibit L** is a true and correct copy of that e-mail correspondence dated October 23, 2018.

23. A few weeks later, Ms. Behnia again said, in response to an e-mail from Mr. Postman, that Uber planned to pay the filing fees and arbitrator retainers before taking up the estoppel issue. Mr. Postman wrote: "JAMS has informed us that Uber has paid arbitrator retainers for only 6 of the initial 47 arbitrations. Does Uber plan to pay the remaining retainers imminently? If not, what is Uber's basis for selectively proceeding with only a fraction of them?" Ms. Behnia responded: "Yes, Uber plans to pay the remaining retainers imminently." Attached hereto as **Exhibit M** is a true and correct copy of that e-mail correspondence dated November 13, 2018.

24. Notwithstanding Uber's repeated representations concerning its intentions to pay the $1,500 filing fee and then raise the fee dispute with the arbitrator once assigned, in Uber's most recent batch of filing fees (paid just this week), it has only paid $1,100 of the $1,500 filing fee. This despite previously telling JAMS that, per the terms of its agreement, it would front Claimants' portion of the filing fee. *See* **Exhibit E**. Attached hereto as **Exhibit N** is a true and correct copy of a letter sent to JAMS and Keller Lenkner by Uber, dated January 24, 2019.

///

///

**Keller Lenkner Engaged Larson O'Brien to Prevent Uber from Further Delaying Its Clients' Ability to Commence Arbitrations Against Uber**

25. Over time, it became clear to me and my colleagues that Uber was not going to timely pay the filing fees in our clients' cases, and that it was in our clients' best interests to move to compel arbitration. We have kept track of how long our clients arbitration demands have been pending absent full-payment of the filing fee by Uber:

| # of Demands Pending at Least $n$ Days ||
| --- | --- |
| **Days** | **Demands** |
| 60 | 12,247 |
| 90 | 8,682 |
| 120 | 3,352 |
| 150 | 105 |

26. At that point, I approached Hon. Stephen G. Larson (Retired) to ask whether Larson O'Brien LLP would agree to litigate the motion to compel arbitration on behalf of our firm's clients. Mr. Larson agreed to take on the representation.

27. Warren Postman has never met with, spoken with, or written to anyone at Larson O'Brien about this engagement. Keller Lenkner has not given Larson O'Brien any work product or other information related to the underlying arbitrations, save for e-mails and attachments such as those cited in this declaration that relate to procedural matters and are relevant to the petition and motion to compel arbitration.

28. We believed it was necessary to retain additional counsel, and to ensure that Mr. Postman never communicated with additional counsel, to avoid giving Uber any opportunity to further delay the arbitration process.

**Uber Changed Its Position on the Arbitration Filing Fees After Larson O'Brien Filed the Motion to Compel Arbitration**

29. In all their communications with my firm, Uber's counsel, Ms. Behnia and Mr. Spurchise, consistently maintained that Uber would pay all of the arbitration fees and that, once individual arbitrators were appointed, it would argue to those arbitrators that each individual

claimant should be required to pay part of the filing fee for his or her arbitration. Neither Ms. Behnia nor Mr. Spurchise ever said that Uber would not pay those fees. Instead, they represented Uber's position as simple and consistent with its arbitration agreement: Uber would pay all the arbitration fees until individual arbitrators could resolve the parties' dispute over a portion of the fees.

30. Before Larson O'Brien filed this petition to compel, Uber never asked my firm to submit the filing fee dispute for all claimants to a single arbitrator as a condition of Uber's agreeing to commence arbitration, as it has since asked Larson O'Brien. Dkt. 53-1 at 132. Uber never asked JAMS to give it that relief either. It still hasn't. Yesterday, JAMS informed Uber that "our policies and procedures … require that we collect a filing fee in each case to be pursued," that "the parties' arbitration agreement appears to clearly prohibit collective determination of any issue absent party agreement," and that it would only "commenc[e] and appoint[] an arbitrator to each case" "following receipt of the filing fees[.]" Attached hereto as **Exhibit O** is a true and correct copy of a letter sent to Uber and Keller Lenkner by JAMS, dated January 23, 2019.

31. Uber's change in position boils down to this: Before this petition, Uber conceded that it was required to pay all of the arbitration filing fees *before* it could dispute the estoppel argument, and that it could dispute the estoppel argument only before individual arbitrators in individual arbitrations. Now—contrary to its own arbitration clause—Uber has represented to this Court that it is required to pay the filing fees only *after* the estoppel argument has been resolved on a collective basis.

**Claimants Will Submit Thousands of Arbitration Fee Waivers**

32. Under § 1284.3 of the California Code of Civil Procedure, an Uber driver whose gross monthly income is less than 300 percent of the federal poverty guidelines need not pay any arbitration fees. To take advantage of this statute, a driver need only submit to the arbitral forum a declaration stating his or her qualification for this fee-waiver provision.

33. Our firm has obtained more than 3,700 fee-waiver declarations thus far and are receiving more every day.

34. During one of the few preliminary hearings that have been conducted so far, Ms. Behnia raised with the arbitrator that Uber wanted to file a motion to compel the driver in that case to pay a portion of the filing fee. I responded by stating that the driver had completed a declaration under Section 1284.3. Ms. Behnia conceded that the driver's declaration mooted Uber's contemplated motion.

**Keller Lenkner's Efforts on Behalf of Uber Drivers**

35. Since I joined Keller Lenkner, I have been personally involved in our efforts on behalf of Uber drivers.

36. One way that our clients found us was by calling a 1-800 number in a radio advertisement. The advertisement advised Uber drivers that Uber may owe them unpaid wages, said that Uber previously settled a case brought by the Federal Trade Commission alleging that Uber lied about how much it pays drivers, and directed Uber drivers to call a toll-free number for more information.

37. Phone calls to that number are answered by trained agents.

38. Since mid-July 2018, those agents have received calls from more than 29,000 individuals, conducted roughly 63,500 separate phone calls, and spent more than 476,000 minutes on the phone with our clients and potential clients.

39. The agents are trained to rely on scripts to answer drivers' questions, determine whether drivers want to become Keller Lenkner clients, and ensure that the drivers meet Keller Lenkner's requirements for becoming a client.

40. The scripts include telling drivers that Keller Lenkner is offering to represent them only in individual arbitration.

41. If a driver was interested in pursuing individual arbitration against Uber and also met the firm's requirements for engagement, then an agent sent the driver an engagement letter by e-mail, text, or physical delivery. The engagement letter clearly states that Keller Lenkner will bring an individual arbitration claim for the client.

///

///

42. After signing engagement letters, drivers received a series of "welcome" e-mails and, from time to time, update e-mails summarizing the overall progress of their claims or reporting developments in the law related to their claims or Uber.

43. Without describing the specific content of our attorney-client communications, I can disclose that the welcome e-mails introduced our firm, explained the arbitration process, explained the legal basis for the drivers' wage-and-hour claims, answered several common questions, and encouraged drivers to send their specific questions to us by e-mail or telephone.

44. The e-mail address and phone number route to a separate center staffed by agents with more training who are specially equipped with several dozen specific scripts keyed to common driver and client concerns. Those agents answer all client e-mails, calls, and text messages and, when appropriate, connect clients to attorneys from our firm.

45. This client-services center averages more than 240 interactions with clients each day. Although we do not have exact figures, we know that the center has sent more than 10,000 unique (i.e., not form) e-mails and text messages and has had hundreds, if not thousands, of conversations with our clients.

46. Any client or prospective client who wishes to speak to an attorney rather than an agent, or who asks a legal question that requires the advice of an attorney, is connected to an attorney. One attorney at our firm is dedicated solely to answering these client e-mails and calls, and another attorney at our firm spends most of her time responding to these client e-mails and calls.

47. Currently, the vast majority of our Uber driver clients who call or write to us receive a response within one or two days.

48. Providing this level of client service to our Uber driver clients is very important to our team and to me personally. I want each client to know that they are represented by a team of lawyers who are working for them, and not like they are just a name and number on a spreadsheet.

49. It has taken substantial time, money, and effort to develop the team, written materials, processes, and equipment required to achieve this level of client service.

**Uber's Accusations About Keller Lenkner**

50. In its opposition papers, Uber makes several false accusations about our firm.

51. The accusations are not relevant to whether Uber has an obligation to arbitrate with our clients, including whether it must pay the filing fees necessary for our clients to commence arbitration. Moreover, because our firm does not want its presence to further delay its clients' claims, we are in the process of referring affected clients to other firms. We expect those referrals to be complete within several weeks.

52. That said, the falsity of Uber's statements about our firm and this litigation do bear on the credibility of Uber arguments. Here are five examples of false or misleading statements in Uber's brief:

53. <u>First</u>, Uber claims that "one of the very same individuals Larson O'Brien purports to represent here has filed a putative class action against Keller Lenkner." Dkt. 53 at 6.

54. That is not true.

55. In late November 2018, a person named Derrick Brown sued our firm in the U.S. District Court for the District of Massachusetts, alleging false advertising and other claims. As alleged in his complaint, Derrick Brown resides in Connecticut. Dkt. 54 at 11, ¶ 39. Mr. Brown of Connecticut is not a petitioner in this action. Our firm never served an arbitration demand on his behalf. He is not currently represented by our firm or Larson O'Brien.

56. Uber appears to be mistakenly referring to one of our firms' clients, Mr. Derrick Brown of Stockton, California. Mr. Brown of California is a petitioner in this action.

57. The client lists we have provided to Uber list each client's city and state, as well as other contact information such as e-mail address, street address, and phone number. These lists were sent to Ms. Behnia, the same lawyer who signed Uber's brief in this Court.

58. Mr. Brown's allegations are by no means a fair and accurate representation of our firm's work for Uber drivers. Indeed, we have gone to great lengths to tell our clients exactly what we are doing, what to expect, and what specifically is happening in their cases.

59. The engagement agreement Mr. Brown signed clearly stated that Mr. Brown was engaging us to bring an individual arbitration on his behalf against Uber. We are confident that

the radio advertisement, the engagement agreement, and our written and telephonic communications with Mr. Brown were clear and accurate.

60. Keller Lenkner has not been served with a summons or a copy of the complaint in Mr. Brown's lawsuit.

61. <u>Second</u>, Uber writes that, "[f]or at least two months prior to Larson O'Brien's commencement of this action, Keller Lenkner had not raised any concerns with respect to the pace at which arbitration proceedings were progressing." Dkt. 53 at 8.

62. That is not true.

63. Larson O'Brien filed this action on December 5, 2018. Dkt. 1. During the preceding two months, our firm repeatedly raised concerns with Uber about its failure to pay filing fees and move forward with these arbitrations. *See* **Exhibits G, L, M**. Our communications with Uber's counsel during that time were primarily focused on Uber's delay in moving forward with the arbitral process. We raised these concerns with Ms. Behnia, the same lawyer who signed Uber's brief in this Court.

64. <u>Third</u>, Uber's brief argues that our firm was incapable of handling our client's arbitrations because we once took five days to issue certain arbitrator strikes and, in another instance, had scheduling conflicts that required an April hearing date. Dkt. 53 at 8.

65. Those statements are misleading.

66. Our firm submitted more than 390 arbitrator strikes on behalf of claimants, generally within 48 hours of receiving Uber's strikes. That JAMS had to follow up with us one time with regard to five strikes says nothing about our firm's ability to conduct these arbitrations.

67. The scheduling issue is also misleading. Uber's brief suggests that the only reason a hearing was scheduled in April is because our firm refused to devote additional lawyers to the matter. Not so. The hearing to which Uber's brief refers was a hearing on Uber's planned motion to disqualify our firm based on Mr. Postman's work for the U.S. Chamber of Commerce. Mr. Postman was to be a live witness at that hearing, so his attendance was mandatory. Uber knew that, so its statement that our "firm nevertheless was unable or unwilling to identify another attorney from the firm to attend" is misleading. Moreover, Uber neglects to mention that its

counsel's schedule and the arbitrator's schedule played a part in the selection of the April date.

68.     <u>Fourth</u>, Uber accuses our firm of waiting five months to serve the California Out-of-State Arbitration Counsel certificate required under § 1284.2 of the California Code of Civil Procedure. Dkt. 53 at 8-9.

69.     This too is misleading.

70.     Section 1284.2 expressly provides that attorneys can submit the required form to an "arbitrator." I and my colleague Marquel Reddish submitted our forms shortly after arbitrators were assigned, for every arbitration in which an arbitrator was assigned. What the statute expressly allows cannot be untimely or improper. There is no legal requirement to submit paperwork related to arbitrations that may never commence.

71.     In other states where arbitrations have not commenced—New York, Massachusetts, and Georgia—Uber has used multi-jurisdictional practice as an excuse for nonpayment. Uber has made this argument in New York, even though nearly half of Keller Lenkner's attorneys—including the attorney that filed the New York demands—are admitted to practice in New York.

72.     <u>Fifth</u>, Uber writes that, "[c]onsistent with the allegations in *Brown*, dozens of claimants have already withdrawn their arbitration demands." Dkt. 53 at 11, n.3.

73.     That is nonsense.

74.     Over more than five months, roughly 40 of the more than 12,000 clients on whose behalf we have served demands have, after we have served those demands, asked us to withdraw them. They represent less than one-third of one percent of all demands served.

75.     I have been involved in every single one of those withdrawals. I cannot reveal what those clients told us about the reasons for their decisions. But I can say that the number-one concern Uber drivers have about asserting their rights against Uber is retaliation by Uber. A significant number of Uber drivers rely on Uber as their sole or primary source of income. Understandably, many are afraid of biting the hand that feeds them.

///

///

1  I declare that the foregoing is true and correct under penalty of perjury under the laws of
2  the United States.  Executed this 24th day of January, 2019 in Chicago, Illinois.
3
4
5             /s/ Tom Kayes
              TOM KAYES
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28